## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **CANOPY FINANCIAL, INC.,** | ) | **CASE NO. 09 B 44943** |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | |
| _____ | ) | |
| | ) | |
| **GUS A. PALOIAN**, not individually but solely | ) | **ADV. NO. _____** |
| as Chapter 7 trustee for Canopy Financial Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DOUGLAS MATTHEW GHERTNER**, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Gus A. Paloian, not individually but solely as Chapter 7 trustee ("Trustee" or "Plaintiff") for the bankruptcy estate ("Bankruptcy Estate") of Canopy Financial, Inc. ("Canopy"), states for his Complaint as follows:

## NATURE OF THE ACTION

1.     This is an adversary proceeding by Canopy's Bankruptcy Estate against Douglas Matthew Ghertner ("Defendant"), a current shareholder of Canopy, to avoid and recover a pre-petition stock redemption transfer in an amount of not less than $31,059.35.  Canopy made this transfer to Defendant on August 25, 2009, as part of a massive fraudulent scheme in which insiders at Canopy, including Jeremy Blackburn ("Blackburn") and Anthony Banas ("Banas" and, together with Blackburn, the "Canopy Insiders"), committed fraud against Canopy, its creditors, its account holders, and its Series D Preferred Stock investors.

2.      The Bankruptcy Estate sent a letter to Defendant on December 15, 2009, demanding that Defendant return the fraudulently transferred funds.  As of the date of this Complaint, however, Defendant has not returned the funds.  Accordingly, the Trustee brings this action to avoid the transfers and recover the transferred funds from Defendant, plus interest, costs, and attorneys' fees and expenses.

## JURISDICTION AND VENUE

3.      On November 25, 2009 ("Petition Date"), Canopy filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division ("Bankruptcy Court").

4.      On December 30, 2009, the Bankruptcy Court entered an order converting Canopy's chapter 11 case to one under chapter 7, *In re Canopy Financial, Inc.*, pending in the Bankruptcy Court as Case No. 09-44943 ("Bankruptcy Case").

5.      The Bankruptcy Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b) because this proceeding arises under the Bankruptcy Code and/or arises in or is related to the Bankruptcy Case.

6.      Venue is proper in this District under 28 U.S.C. § 1409(a).

7.      This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (F), (H) and (O).

## THE PARTIES AND RELATED ENTITIES

8.      Plaintiff Gus A. Paloian is the chapter 7 trustee for Canopy, duly appointed under section 701 of the Bankruptcy Code by the United States Trustee on December 30, 2009.

9.      Canopy is a Delaware corporation, headquartered in Chicago, Illinois.

10.    On information and belief, Defendant is a resident of Nashville, Tennessee.  At all times relevant to this Complaint, Defendant was a shareholder of Canopy.

## BACKGROUND

**Canopy Financial Inc.**

11.    At all times relevant to this Complaint, Canopy was a provider of healthcare insurance related banking, investing, invoice payment, management, accounting and processing services.  Canopy provided its clients with a means to administer and manage employee health savings and flexible spending accounts.  Canopy developed and marketed computer software programs for banks, financial institutions, insurance companies, healthcare payers, and individuals to administer and process payments of monies through healthcare-related accounts such as Health Savings Accounts ("HSA") and Flexible Spending Accounts ("FSA").  Canopy's products and services related to, among other things, expense tracking, online bill payment, Automated Clearing House processing, accounting and confirmation of payments, and account management. Canopy maintained offices in San Francisco, California; Plainsboro, New Jersey; and Chicago, Illinois.

12.    Canopy's products, including a software platform called HealthDirect, allowed individuals ("Canopy clients" or "clients") to deposit money into healthcare-related accounts and pay healthcare expenses.  Certain clients obtained Canopy's services through third-party healthcare plan providers ("Canopy customers" or "customers") who contracted with Canopy for Canopy's services.  Other clients directly contracted with Canopy through its "Wellfund" HSA program.  Client funds were to be deposited and held in custodial accounts at financial institutions and were to be used solely for client-directed healthcare-related payments.

13.    Canopy earned revenue based, in part, on fees it charged for every individual client account using the Canopy platform.

14.     Canopy maintained several bank accounts to fund its day-to-day operations ("operating accounts").

15.     Accounts into which client custodial funds were deposited were maintained at Amcore Bank, Ridgestone Bank, and other financial institutions on behalf of individual clients.

16.     Blackburn was a co-founder of Canopy.  At all times relevant to this Complaint, Blackburn was the President and Chief Operating Officer of Canopy.  Blackburn was a director and shareholder of Canopy, and a signatory to a Canopy custodial account at Amcore Bank. Blackburn also served as the senior financial officer for the company.

17.     Banas was a co-founder of Canopy and its Chief Technology Officer.  At all times relevant to this Complaint, Banas was a director and shareholder of Canopy, and a signatory to a Canopy custodial account at Amcore Bank.

**Misappropriation of Client Funds**

18.     From at least 2008 through 2009, Blackburn and Banas fraudulently converted at least $16,000,000 from client custodial funds in order to use those funds to pay operating expenses of Canopy and to benefit themselves personally.

19.     Blackburn and Banas sought to conceal their theft of funds through various means, including falsifying statements to certain customers and clients concerning interest on deposits; misrepresentations to customers about the location and existence of client funds; and misrepresentations to other Canopy employees.

20.     Blackburn and Banas authorized and fraudulently caused transfers of funds from client custodial fund accounts at Amcore Bank and Ridgestone Bank into Canopy operating accounts.

21.     In order to encourage and preserve client deposits into custodial accounts and to continue to use such funds, Banas falsely represented to certain Canopy customers that client deposits earned up to 4.25% annual interest.

22.     Banas caused Canopy's systems to falsely represent to certain individual clients that their deposits earned up to 4.25% annual interest.  In fact, the interest earned or credited to the funds on deposit at Amcore Bank was well below 4.25%, and the balances reported by Canopy's systems to such clients were not truthful statements of the client funds on deposit.

23.     Beginning no later than October 2008, Blackburn began preparing Monthly Operating Reports ("MORs") for Canopy in which Blackburn, among other misrepresentations, falsely stated the total number of client accounts on the Canopy platform and the total revenue earned by Canopy for a preceding month.  In the MORs, Blackburn falsely represented that Canopy's revenues exceeded expectations.

24.     Blackburn also prepared investor materials discussing Canopy's business that misrepresented the number of clients and misrepresented that certain companies were clients of Canopy.  In many cases, there were no agreements with these entities or they were simply prospects for future business.  Entities such as Blue Cross of Massachusetts, Blue Cross Blue Shield Federal Employee Program, and Cigna were falsely represented as current clients of Canopy when they were not.

25.     The preparation of false MORs and other false materials was designed to conceal the true financial state of Canopy and to conceal the misappropriation of funds.

26.     Beginning in 2008 and continuing to November 2009, Blackburn and Banas caused and directed the misappropriation of millions of dollars from Canopy operating accounts for their personal benefit.  Among the misappropriations were:

     a.     More than $2 million for shared interests in private jets;

     b.     More than $2 million to luxury automobile dealers for the purchase of at least twenty luxury or exotic automobiles for their personal benefit;

     c.     More than $2 million to a ticket broker for their personal benefit;

     d.     Approximately $2 million toward the purchase price of a multi-million dollar private estate in Malibu, California; and

     e.     Millions of dollars of customer and Canopy funds to their personal bank accounts.

27.     In addition to the foregoing, Blackburn and Banas used Canopy funds for investments in unrelated businesses.

**The Series D Preferred Stock Investment**

28.     Spectrum Equity Investors ("Spectrum") is an investment firm managing funds on behalf of general and limited partners.  Spectrum is based in Boston, Massachusetts.

29.     Beginning in or about October 2008, Spectrum originally considered investing approximately $35,000,000 in Canopy.  Later, in July 2009, pursuant to a stock purchase agreement and as part of a Series D preferred stock offering ("Series D Stock Offering"), Spectrum, through two Spectrum-managed funds, purchased approximately $60,500,000 in Canopy Series D preferred stock.  In August 2009, the Spectrum funds additionally purchased approximately $1,900,000 in Canopy Series D preferred stock.

30.     In July 2009, investors associated with other private equity and venture capital firms purchased approximately $2.5 million in Canopy Series D preferred stock.

31.     In August 2009, funds associated with Performance Equity Management, LLC, purchased approximately $10,000,000 in Canopy Series D preferred stock.

32.     KPMG LLP ("KPMG") is an international network of firms providing audit, tax and advisory services.  Among the services provided by KPMG are independent audits of a company's financial condition.

33.     In 2009, Spectrum and other potential investors in Canopy required Canopy to provide the investors with audited financial statements for the fiscal year ended December 31, 2008, as a prerequisite to investing in Canopy.

34.     In response to this requirement, Blackburn, with Banas' assistance or acquiescence, created false financial statements and a false financial audit report that purported to be issued by KPMG.  Blackburn, with Banas' assistance or acquiescence, drafted the KPMG financial audit report and fraudulently superimposed the KPMG logo and a KPMG signature upon the fabricated report.  The fabricated KPMG audited financial statements falsely stated that Canopy's revenue exceeded its expenses and that revenue had grown significantly from 2007 to 2008.  The receipt of the fabricated audited financial statements was material to Spectrum's decision to invest in Canopy.

35.     In addition to the fabricated KPMG financial audit report, in May 2009 Blackburn caused MORs for February and March 2009 to be submitted to Spectrum as part of Spectrum's consideration of an investment in Canopy.  The MORs were material to Spectrum's valuation of Canopy.  The MORs were not truthful statements about Canopy revenue, but were materially inflated representations of Canopy's revenues and value intended to induce Spectrum to invest in Canopy.

36.     On or about June 30, 2009, Blackburn caused the fabricated KPMG audited financial statements to be submitted to Spectrum.

37.     Blackburn, with Banas' assistance or acquiescence, prepared altered bank statements that falsely represented that approximately $5.7 to $8.9 million in cash balances were in a Canopy bank account at Northern Trust Company for the period of January through June 2009.  Blackburn and Banas knew that, in fact, no such Canopy account existed and Canopy did

not have approximately $5.7 to $8.9 million in available cash on deposit in any operating account.

38.     Blackburn and Banas caused the altered bank statements to be submitted to Spectrum in July 2009 in order to induce Spectrum to invest in Canopy.

39.     Spectrum relied on the false representations contained in the MORs, the fabricated KPMG audited financial statements, and the altered bank statements, among other false representations, in deciding to invest in Canopy.

40.     These misrepresentations caused Spectrum and others to invest a total of approximately $75,000,000 in Canopy in July and August 2009 in the Series D Stock Offering.

**Fraudulent Transfers**

41.     As a result of the Canopy Insiders' scheme, more than $90 million was improperly and unlawfully obtained, misappropriated and/or converted from Canopy, its creditors, investors, customers, and clients, including:

   a.  Approximately $75 million in proceeds from the Series D Stock Offering; and

   b.  At least $16 million in proceeds from Canopy client custodial funds accounts intended to be used for client healthcare payments.

42.     On November 30, 2009, the Securities and Exchange Commission ("SEC") filed a complaint against Canopy and Blackburn in *S.E.C. v. Canopy Financial, Inc. and Jeremy J. Blackburn,* Case No. 09 CV 7429, in the United States District Court for the Northern District of Illinois, alleging securities fraud in connection with the Series D Stock Offering.  On that same date, the U.S. Attorney for the Northern District of Illinois charged Blackburn with wire fraud in a criminal complaint.

43.     On March 1, 2010, the U.S. Attorney's Office for the Northern District of Illinois charged Blackburn and Banas with two counts of wire fraud in an information.

44.     On March 26, 2010, the Trustee filed an adversary complaint in the Bankruptcy Court against Blackburn and Banas, Adv. No. 10-00413, seeking to recover actual damages exceeding $50 million.  Banas has responded to the adversary complaint by asserting that an answer may tend to incriminate him in violation of his privileges under the Fifth Amendment of the United States Constitution and Article I, Section 10 of the Illinois Constitution.

45.     On June 9, 2010, the Bankruptcy Court entered judgment against Blackburn in the amount of $93,125,924.46.

**Stock Redemptions**

46.     On August 25, 2009, in connection with the Series D Stock Offering, Canopy transferred not less than $31,059.35 ("Transferred Funds") to Defendant in a transaction characterized as a redemption of 4,650 shares of Series A preferred stock in Canopy under a Share Redemption Agreement between Canopy and Defendant (the "Transfer").  A copy of the Share Redemption Agreement is attached to this Complaint as **Exhibit 1** ("Share Redemption Agreement").

47.     Canopy transferred the Transferred Funds to Defendant from Canopy's Silicon Valley Bank checking account number 3300480352.  A copy of the check that Canopy used to facilitate the Transfer to Defendant is attached to this Complaint as **Exhibit 2**.  The check was honored by Silicon Valley Bank on August 25, 2009.

48.     Section 3.2 of the Share Redemption Agreement states: "This Agreement constitutes the valid and legally binding obligation of the Company, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws of general application affecting enforcement

of creditors' rights generally and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies."

## COUNT ONE

### Avoidance and Recovery of Fraudulent Transfer Under Bankruptcy Code §§ 548(a)(1)(A) and 550(a)

49.     Plaintiff restates and re-alleges paragraphs 1 through 48 of this Complaint as though fully set forth herein.

50.     The Transfer is a transfer of interest of Canopy in property.

51.     The Transfer was made within two years before the Petition Date.

52.     The Transfer was made as part of and in furtherance of the Canopy Insiders' scheme, as described in this Complaint, with actual intent to hinder, delay, or defraud one or more entities to which Canopy was or became, on or after the date the Transfer was made, indebted.

53.     The Trustee may avoid the Transfer under Bankruptcy Code § 548(a)(1)(A).

54.     Defendant was the initial transferee of the Transfer, the entity for whose benefit the Transfer was made, or the immediate or mediate transferee of such initial transferee.

55.     The Trustee may recover, for the benefit of the estate, the Transferred Funds or their value from Defendant under Bankruptcy Code § 550(a).

WHEREFORE, Plaintiff respectfully requests that the Court enter an order: avoiding the Transfer under Bankruptcy Code § 548(a)(1)(A); ordering Defendant to return the Transferred Funds to the Trustee, or entering judgment against Defendant in the amount of the Transferred Funds, under Bankruptcy Code § 550(a); awarding Canopy pre-judgment interest, post-judgment interest, costs, and attorneys' fees and expenses; and granting any other relief the Court deems just and proper.

## <u>COUNT TWO</u>

### Avoidance and Recovery of Fraudulent Transfer Under
### 740 ILCS 160/5(a)(1) and 160/8(a), and Bankruptcy Code §§ 544(b)(1) and 550(a)

56.     Plaintiff restates and re-alleges paragraphs 1 through 55 of this Complaint as though fully set forth herein.

57.     The Transfer is a transfer of interest of Canopy in property.

58.     This Complaint was filed within four years after the Transfer was made.

59.     The Transfer was made as part of and in furtherance of the Canopy Insiders' scheme, as described in this Complaint, with actual intent to hinder, delay, or defraud one or more of Canopy's creditors within the meaning of section 5 of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1, *et seq.* ("<u>UFTA</u>").

60.     The Transfer is voidable under UFTA §§ 5(a)(1) and 8(a) by a creditor holding an unsecured claim that is allowable under Bankruptcy Code § 502 or that is not allowable only under Bankruptcy Code § 502(e).

61.     Under UFTA § 9(b), such creditor could obtain a judgment for the value of the Transferred Funds against Defendant as the first transferee of the Transferred Funds, the person for whose benefit the Transfer was made, or a subsequent transferee.

62.     The Trustee may avoid the Transfer under Bankruptcy Code § 544(b)(1).

63.     Defendant was the initial transferee of the Transfer, the entity for whose benefit the Transfer was made, or the immediate or mediate transferee of such initial transferee.

64.     The Trustee may recover, for the benefit of the estate, the Transferred Funds or their value from Defendant under Bankruptcy Code § 550(a).

WHEREFORE, Plaintiff respectfully requests that the Court enter an order: avoiding the Transfer under UFTA §§ 5(a)(1) and 8(a) and Bankruptcy Code §§ 544(b)(1) and 550(a);

ordering Defendant to return the Transferred Funds to the Trustee, or entering judgment against Defendant in the amount of the Transferred Funds, under Bankruptcy Code § 550(a); awarding Canopy pre-judgment interest, post-judgment interest, costs, and attorneys' fees and expenses; and granting any other relief the Court deems just and proper.

## COUNT THREE

**Avoidance and Recovery of Fraudulent Transfer Under
Bankruptcy Code §§ 548(a)(1)(B) and 550(a)**

65.     Plaintiff restates and re-alleges paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.     The Transfer is a transfer of interest of Canopy in property.

67.     The Transfer was made within two years before the Petition Date.

68.     Canopy received less than a reasonably equivalent value in exchange for the Transfer.

69.     Canopy was insolvent on the date the Transfer was made, or became insolvent as a result of the Transfer.

70.     At the time the Transfer was made, Canopy was engaged in business or a transaction, or was about to engage in business or a transaction, for which Canopy's remaining property was unreasonably small capital.

71.     At the time the Transfer was made, Canopy intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

72.     The Trustee may avoid the Transfer under Bankruptcy Code § 548(a)(1)(B).

73.     Defendant was the initial transferee of the Transfer, the entity for whose benefit the Transfer was made, or the immediate or mediate transferee of such initial transferee.

74.    The Trustee may recover, for the benefit of the estate, the Transferred Funds or their value from Defendant under Bankruptcy Code § 550(a).

WHEREFORE, Plaintiff respectfully requests that the Court enter an order: avoiding the Transfer under Bankruptcy Code § 548(a)(1)(B); ordering Defendant to return the Transferred Funds to the Trustee, or entering judgment against Defendant in the amount of the Transferred Funds, under Bankruptcy Code § 550(a); awarding Canopy pre-judgment interest, post-judgment interest, costs, and attorneys' fees and expenses; and granting any other relief the Court deems just and proper.

## COUNT FOUR

**Avoidance and Recovery of Fraudulent Transfer Under
740 ILCS 160/5(a)(2) and 160/8(a), and Bankruptcy Code §§ 544(b)(1) and 550(a)**

75.    Plaintiff restates and re-alleges paragraphs 1 through 74 of this Complaint as though fully set forth herein.

76.    The Transfer is a transfer of interest of Canopy in property.

77.    This Complaint was filed within four years after the Transfer was made.

78.    Canopy made the Transfer without receiving a reasonably equivalent value in exchange for the Transfer.

79.    At the time the Transfer was made, Canopy was engaged or was about to engage in a business or a transaction for which the remaining assets of Canopy were unreasonably small in relation to the business or transaction.

80.    At the time the Transfer was made, Canopy intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

81.     The Transfer is voidable under UFTA §§ 5(a)(2) and 8(a) by a creditor holding an unsecured claim that is allowable under Bankruptcy Code § 502 or that is not allowable only under Bankruptcy Code § 502(e).

82.     Under UFTA § 9(b), such creditor could obtain a judgment for the value of the Transferred Funds against Defendant as the first transferee of the Transferred Funds, the person for whose benefit the Transfer was made, or a subsequent transferee.

83.     The Trustee may avoid the Transfer under Bankruptcy Code § 544(b)(1).

84.     Defendant was the initial transferee of the Transfer, the entity for whose benefit the Transfer was made, or the immediate or mediate transferee of such initial transferee.

85.     The Trustee may recover, for the benefit of the estate, the Transferred Funds or their value from Defendant under Bankruptcy Code § 550(a).

WHEREFORE, Plaintiff respectfully requests that the Court enter an order: avoiding the Transfer under UFTA §§ 5(a)(2) and 8(a) and Bankruptcy Code §§ 544(b)(1) and 550(a); ordering Defendant to return the Transferred Funds to the Trustee, or entering judgment against Defendant in the amount of the Transferred Funds, under Bankruptcy Code § 550(a); awarding Canopy pre-judgment interest, post-judgment interest, costs, and attorneys' fees and expenses; and granting any other relief the Court deems just and proper.

## <u>COUNT FIVE</u>

### Avoidance and Recovery of Fraudulent Transfer Under
### 740 ILCS 160/6(a) and 160/8(a), and Bankruptcy Code §§ 544(b)(1) and 550(a)

86.     Plaintiff restates and re-alleges paragraphs 1 through 85 of this Complaint as though fully set forth herein.

87.     The Transfer is a transfer of interest of Canopy in property.

88.     This Complaint was filed within four years after the Transfer was made.

89.     Canopy made the Transfer without receiving a reasonably equivalent value in exchange for the Transfer.

90.     Canopy was insolvent at the time the Transfer was made or became insolvent as a result of the Transfer.

91.     The Transfer is voidable under UFTA §§ 6(a) and 8(a) by a creditor holding an unsecured claim that is allowable under Bankruptcy Code § 502 or that is not allowable only under Bankruptcy Code § 502(e).

92.     Under UFTA § 9(b), such creditor could obtain a judgment for the value of the Transferred Funds against Defendant as the first transferee of the Transferred Funds, the person for whose benefit the Transfer was made, or a subsequent transferee.

93.     The Trustee may avoid the Transfer under Bankruptcy Code § 544(b)(1).

94.     Defendant was the initial transferee of the Transfer, the entity for whose benefit the Transfer was made, or the immediate or mediate transferee of such initial transferee.

95.     The Trustee may recover, for the benefit of the estate, the Transferred Funds or their value from Defendant under Bankruptcy Code § 550(a).

WHEREFORE, Plaintiff respectfully requests that the Court enter an order: avoiding the Transfer under UFTA §§ 6(a) and 8(a) and Bankruptcy Code §§ 544(b)(1) and 550(a); ordering Defendant to return the Transferred Funds to the Trustee, or entering judgment against Defendant in the amount of the Transferred Funds, under Bankruptcy Code § 550(a); awarding Canopy pre-judgment interest, post-judgment interest, costs, and attorneys' fees and expenses; and granting any other relief the Court deems just and proper.

## COUNT SIX

### Unjust Enrichment

96.     Plaintiff restates and re-alleges paragraphs 1 through 95 of this Complaint as though fully set forth herein.

97.     As a result of the Transfer and the fraud perpetrated by the Canopy Insiders, Defendant wrongfully received direct and indirect benefits from Canopy that should have inured to the benefit of Canopy and its creditors.

98.     Defendant has been unjustly enriched and equity requires that Defendant disgorge and pay the amounts by which Defendant has been unjustly enriched.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant in the amount of the Transferred Funds (plus pre-judgment interest, post-judgment interest, costs, and attorneys' fees and expenses), and grant any other relief the Court deems just and proper.

## COUNT SEVEN

### Disallowance of Claims

99.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

100.    The Defendant may file proofs of claim in the Bankruptcy Case, including but not limited to claims arising from recoveries hereunder by the Trustee.

101.    Defendant has failed to turn over to Plaintiff property of Canopy's estate that is recoverable by Plaintiff, namely the amounts demanded in Counts One through Six above.

102.    Pursuant to Section 502(d) of the Bankruptcy Code, each claim asserted by the Defendant must be disallowed because property of Canopy's estate is recoverable from Defendant and Defendant has not turned over that property to Plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order disallowing each and every claim that Defendant may assert against Canopy, and granting such other relief as may be just and proper.

Dated:  July 22, 2010

Respectfully submitted,

Gus A. Paloian, not individually but solely as Chapter 7 Trustee for Canopy Financial, Inc.

By:   /s/ Andrew V. Banas
   One of His Attorneys

Brian P. Roche (6270507)
James B. Sowka (6291998)
Andrew V. Banas (023886)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603-5577
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

Christopher F. Robertson, *pro hac vice*
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210-2028
Telephone: (617) 946-4800
Facsimile: (617) 946-4801

**Counsel for Gus A. Paloian, not individually but solely as Chapter 7 Trustee for Canopy Financial, Inc.**

**EXHIBIT 1**

## SHARE REDEMPTION AGREEMENT

THIS SHARE REDEMPTION AGREEMENT (this "**Agreement**") is made as of the 19th of August, 2009, by and among Canopy Financial, Inc., a Delaware corporation (the "**Company**"), and the person(s) listed on Exhibit A attached hereto (the "**Seller**").

WHEREAS, the Company entered into a Series D Preferred Stock Purchase Agreement on July 15, 2009 with the purchasers listed on Schedule I attached thereto (the "**Purchasers**") (the "**Purchase Agreement**" and the sale and issuance of shares of the Company's Series D Preferred Stock under such agreement, the "**Series D Financing**") pursuant to which, *inter alia,* up to $11,926,752 of the proceeds from the sale and issuance of shares of the Company's Series D Preferred Stock in the Second Closing (as defined in the Purchase Agreement) will be used by the Company to purchase up to 10% of the aggregate number of outstanding shares of each holder of the Company's Series A Preferred Stock, par value $0.001, and Common Stock, par value $0.001 (the "**Shares**");

WHEREAS, the Company distributed a Repurchase Offer Information Statement on July 15, 2009 (the "**Information Statement**") to all holders of the Shares offering to redeem up to 10% of the Shares held by each holder in exchange for the consideration and on the terms set forth herein; and

WHEREAS, the Seller has indicated in response to such offer its intention to have the Company redeem that number of Shares set forth on Exhibit A attached hereto.

NOW, THEREFORE, the parties hereby agree as follows:

1.    Redemption of Shares; Closing.

1.1    Redemption of Shares.   Subject to the terms and conditions of this Agreement, the Seller agrees (severally and not jointly, as applicable) to sell, transfer, assign, convey and deliver to the Company at the Redemption Closing (as defined below) that number of Shares set forth opposite the Seller's name on Exhibit A attached hereto under the heading "Number of Shares Redeemed" (the "**Seller Shares**") at a price of $6.679430 per share of Series A Preferred Stock and $6.503655 per share of Common Stock (such share number and price per share as equitably adjusted for stock splits, stock dividends, combinations, recapitalizations and the like after the date of this Agreement but prior to the Redemption Closing) (the "**Per Share Price**") and the Company agrees to purchase, acquire and redeem the Seller Shares from the Seller at the Redemption Closing at the Per Share Price (the entire such transaction being referred to herein as the "**Redemption**"). The aggregate consideration payable to the Seller at the Redemption Closing shall be referred to herein as the "**Gross Redemption Proceeds.**"

1.2    Redemption Closing.   The Redemption shall take place at the offices of Wilson Sonsini Goodrich & Rosati, Professional Corporation, 650 Page Mill Road, Palo Alto, California 94304 at 10:00 A.M. Pacific Time, on August 19, 2009, or at such other time and place as the Company and the Sellers holding a majority of the shares agree upon orally or in writing (which time and place are designated as the "**Redemption Closing**"). At the Redemption Closing (a) the Seller shall deliver to the Company stock certificate(s) representing the Seller Shares redeemed by the Seller at the Redemption Closing, duly endorsed to the Company and accompanied by a duly executed assignment separate from certificate in the form provided by the Company and (b) subject to the terms and conditions of this Agreement, the Company shall pay to the Seller by check, wire transfer or any combination thereof (x) the Gross Redemption Proceeds *less* (y) any applicable tax withholding, as set forth opposite the Seller's name on Exhibit A attached hereto under the heading "Net Redemption Proceeds" (the "**Net Redemption Proceeds**"). Upon consummation of the Redemption, the Company shall cancel the stock certificate(s)

and shall issue a new stock certificate to the Seller representing the balance of Seller's unpurchased shares.

2.    Representations and Warranties of the Seller. The Seller (severally and not jointly, as applicable) hereby represents and warrants to the Company that:

2.1    Ownership of Shares. The Seller owns all right, title and interest (legal and beneficial) in and to all of the Seller Shares being sold by the Seller pursuant to this Agreement free and clear of all liens, including, but not limited to, any lien, pledge, claim, security interest, encumbrance, mortgage, assessment, charge, restriction or limitation of any kind, whether arising by agreement, operation of law or otherwise, except for those imposed by applicable federal and state securities laws or imposed by agreement between the Seller and the Company.

2.2    Authority. The Seller has the full power and authority to sell, transfer, assign, convey and deliver to the Company the Seller Shares being purchased, acquired and redeemed by the Company, and upon delivery and payment for the Seller Shares at the Redemption Closing, the Company shall acquire valid and unencumbered title to the Seller Shares to be delivered by the Seller hereunder.

2.3    Enforceability. This Agreement constitutes the valid and legally binding obligation of the Seller, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws of general application affecting enforcement of creditors' rights generally and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2.4    No Consents. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any foreign, federal, state or local governmental authority or any other third party on the part of the Seller is required in connection with the consummation of the transactions contemplated by this Agreement.

2.5    Compliance with Other Instruments. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby will not result in a violation of, or default under, any instrument, judgment, order, writ, decree or contract to which the Seller is a party or to which Seller is bound, or an event that results in the creation of any lien, charge or encumbrance upon the Seller Shares being sold by the Seller. The Seller has received as of the Redemption Closing all consents or waivers necessary to transfer the Seller Shares being redeemed by the Seller to the Company and such transfer is not subject to any right of notice, first refusal, preemptive, tag-along or drag-along right or other comparable obligations or restrictions.

2.6    Litigation. There is no action, suit, proceeding or investigation pending or, to the Seller's knowledge, currently threatened that questions the validity of this Agreement, or the right of the Seller to enter into this Agreement or to consummate the transaction contemplated hereby.

2.7    Receipt of Information; Consideration. The Seller believes it has received all the information he considers necessary or appropriate for deciding whether to enter into this Agreement and perform the obligations set forth herein. The Seller hereby represents that it has had an opportunity to ask questions and receive answers from the Company regarding the business, properties, prospects and financial condition of the Company, including, without limitation, any strategic transaction, public securities offering, private financing transaction (whether debt or equity), merger, consolidation, recapitalization, reclassification, reorganization, change of control transaction, sale of assets or securities, liquidation or similar transaction which have been, are being or may be contemplated by the Company. The Seller has carefully reviewed the Company's Information Statement, and hereby confirms that the Seller is relying on no other information, whether delivered by the Company or any other person, in

-2-

making its decision to sell the Seller Shares to be sold by the Seller. The Seller hereby acknowledges that any future sale or purchase of shares of the Company's capital stock could be at a premium or a discount relative to the Per Share Price being paid to the Seller, and that such sale or purchase could occur at any time or not at all. The Seller hereby acknowledges that it has not relied on any representation or statement of the Purchasers in making its investment decision in selling the Seller Shares to be sold by the Seller. The Seller acknowledges and agrees that the Per Share Price represents fair consideration and at least reasonably equivalent value for the Shares.

2.8     Taxes. The Seller acknowledges that the Company has advised him that there may be adverse tax consequences to the Seller in consummating the sale of the Seller Shares. The Seller also acknowledges that Company has advised the Seller that (a) such tax consequences will vary with the Seller's own personal circumstances, applicable state tax laws and, in some cases, local tax laws, and (b) the Seller should consult with his own tax advisor regarding all tax consequences relating to the sale of the Seller Shares under this Agreement. The Company makes no representations or warranties with respect to the tax consequences of the sale of the Seller Shares under the terms of this Agreement. The Seller agrees and understands that Seller is responsible for payment, if any, of local, state, and/or federal taxes on the payments and any other consideration provided hereunder by the Company and any penalties or assessments thereon. The Seller further agrees to indemnify and hold the Company harmless from any claims, demands, deficiencies, penalties, interest, assessments, executions, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of (a) the Seller's failure to pay or delayed payment of, federal or state taxes, or (b) damages sustained by the Company by reason of any such claims, including attorneys' fees and costs.

3.     Representations and Warranties of the Company. The Company hereby represents and warrants that:

3.1     Authorization. The execution and delivery of this Agreement, the performance of all obligations of the Company hereunder, and the redemption of the Seller Shares by the Company hereunder, have been duly and validly authorized by all necessary action on the part of the Company.

3.2     Enforceability. This Agreement constitutes the valid and legally binding obligation of the Company, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws of general application affecting enforcement of creditors' rights generally and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

3.3     Compliance with Other Instruments. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby will not result in a material violation of, or default under, the certificate of incorporation or bylaws of the Company or any instrument, judgment, order, writ, decree or material contract known to the Company to which the assets of the Company are subject.

4.     Conditions to the Redemption Closing.

4.1     Conditions of Company's Obligations at the Redemption Closing. The obligations of the Company under Section 1.1 and Section 1.2 of this Agreement are subject to the fulfillment on or before the Redemption Closing of each of the following conditions:

(a)     Representations and Warranties. The representations and warranties of the Seller contained in Section 2 shall be true on and as of the Redemption Closing with the same effect as though such representations and warranties had been made on and as of the Redemption Closing.

(b)    Performance.    The Seller shall have performed and complied in all material respects with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Seller on or before the Redemption Closing.

(c)    Qualifications.    All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful purchase of the Seller Shares pursuant to this Agreement shall be duly obtained and effective as of the Redemption Closing.

(d)    Proceedings and Documents.    All corporate and other proceedings in connection with the transactions contemplated at the Redemption Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Company, and they shall have received all such counterpart original and certified or other copies of such documents as they may reasonably request.

(e)    Second Closing Under Purchase Agreement.    A Second Closing (as such term is defined in the Purchase Agreement) shall have taken place in which proceeds from the issuance and sale of the Company's Series D Preferred Stock that may be used, pursuant to the terms of the Purchase Agreement, to effect the share redemptions contemplated by the Purchase Agreement are sufficient to do so.

4.2    Conditions of the Seller's Obligations at the Redemption Closing.    The obligations of the Seller to the Company under this Agreement are subject to the fulfillment on or before the Redemption Closing of each of the following conditions by the Company:

(a)    Representations and Warranties.    The representations and warranties of the Company contained in Section 3 shall be true on and as of the Redemption Closing with the same effect as though such representations and warranties had been made on and as of the Redemption Closing.

(b)    Payment of Net Redemption Proceeds; Performance.    The Company shall have delivered the applicable Net Redemption Proceeds to be paid to the Seller and the Company shall have performed and complied in all material respects with all other agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before the Redemption Closing.

(c)    Qualifications.    All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful purchase of the Seller Shares pursuant to this Agreement shall be duly obtained and effective as of the Redemption Closing.

5.    Indemnification; Release.

5.1    Indemnification.    The Seller hereby agrees that it (an "**Indemnifying Party**") shall indemnify and hold harmless the Company, its affiliates, subsidiaries (direct and indirect), directors, officers, employees, agents lenders (and agents related thereto) and representatives (each, an "**Indemnified Party**") against any losses, claims, damages or liabilities to which an Indemnified Party may become subject, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any breach of the representations, warranties, covenants and agreements made by the Seller in connection with this Agreement (collectively, "**Indemnified Losses**").

5.2    Release.    Effective as of the Redemption Closing, and in partial consideration of the consummation of the transactions set forth herein, the Seller, for itself and its heirs, successors, assigns, family members, agents and affiliates (collectively, including the Seller, the "**Releasors**"), hereby

-4-

forever fully, irrevocably and unconditionally releases and discharges (i) the Company, its affiliates, subsidiaries (direct and indirect), stockholders, directors, officers, employees, agents, lenders (and agents related thereto), counsel, advisors and representatives (collectively, the "**Company Released Parties**") from any and all actions, suits, claims, demands, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, promises, judgments, liabilities or obligations of any kind whatsoever in law or equity and causes of action of every kind and nature, or otherwise (including, claims for damages, costs, expenses, and attorneys', brokers' and accountants' fees and expenses) and (ii) each of the Purchasers and the affiliates, subsidiaries (direct and indirect), members (direct and indirect), partners (direct and indirect), managers, directors, officers, employees, agents, lenders (and agents related thereto), counsel, advisors and representatives thereof (collectively, the "**Investor Released Parties**" and together with the Company Released Parties, the "**Released Parties**") arising out of or related to events, facts, conditions or circumstances existing or arising on or prior to the Redemption Closing, in each case, to the extent related to the Company, the Series D Financing, the share redemptions effected in connection therewith and related strategic transactions, which such Releasors can, shall or may have against the Released Parties, whether known or unknown, suspected or unsuspected, unanticipated as well as anticipated and that now exist (collectively, "**Released Claims**"). Notwithstanding any provision of this Section 5.2 to the contrary, the provisions hereof shall not release or otherwise diminish (a) the obligations of the Company for the payment of (i) accrued and unpaid wages, fees or benefit obligations of the Company explicitly entered into by the Company in connection with Releasor's provision of services to the Company, including but not limited to, outstanding employment and consulting agreements, employee benefit plans and outstanding stock option agreements, (ii) accrued and unreimbursed business expenses of the nature generally reimbursed by the Company incurred by Releasor in accordance with the Company's reimbursement policies, (iii) claims made by Seller for breach of this Agreement or (b) any claims pursuant to other written contracts between the Seller and the Released Parties. Each of the Releasors hereby irrevocably agrees to refrain from directly or indirectly asserting any claim or demand or commencing (or causing to be commenced) any suit, action, or proceeding of any kind, in any court or before any tribunal, against any Released Party based upon any Released Claim. The Released Parties are intended third-party beneficiaries of this Section 5.2 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. The Seller, on behalf of the Releasors, hereby acknowledges that such person has been advised by legal counsel and is familiar with Section 1542 of the California Civil Code (or the analogous provision of any other applicable state or federal statute or common law principle of similar effect), which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Seller, on behalf of the Releasors, acknowledges that such person may have sustained damage, loss, cost or expense that is presently unknown or unsuspected, and that such damage, loss, cost or expense as may have been sustained may give rise to additional damage, loss, cost or expense in the future. Nevertheless, the Seller, on behalf of the Releasors, acknowledges that this Section 5.2 has been negotiated and agreed upon in light of this situation and expressly waives any and all rights which such person may have under Section 1542 of the California Civil Code, or any other state or federal statute or common law principle of similar effect.

6.   Miscellaneous.

    6.1   Further Assurances.   Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and

additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

6.2   Successors and Assigns.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.

6.3   Governing Law.  This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents entered into and to be performed entirely within Delaware.

6.4   Counterparts; Facsimile.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may also be executed and delivered by facsimile signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.5   Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.6   Notices.  All notices, requests, consents and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given, delivered and received (a) upon personal delivery, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after the business day of deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt, in each case to the intended recipient. All communications shall be sent to the respective parties at their addresses as set forth on the signature pages hereto, or to such email address, facsimile number, or address as subsequently modified by written notice given in accordance with this Section 6.6.  If notice is given to the Company, a copy shall also be sent to Caine T. Moss, Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, CA 94304.

6.7   Finder's Fee.  Except for any fees owed to Financial Technology Partners LP, FTP Securities LLC and their affiliates, each party represents that it neither is nor will be obligated for any finders' fee or commission in connection with this transaction.  Each party agrees to indemnify and hold harmless the other parties from any liability for any commission or compensation in the nature of a finders' fee (and the costs and expenses of defending against such liability or asserted liability) for which such party or any of its directors, stockholders, employees or representatives is responsible.

6.8   Amendment and Waivers.  Any term of this Agreement may be amended or waived only with the written consent of the Company and the Sellers holding a majority of the Shares. Any amendment or waiver effected in accordance with this Section 6.8 shall be binding upon each Seller and the Company.

6.9   Severability.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.10   Survival of Representations and Warranties.  The representations, warranties and covenants made by the Seller shall survive the Redemption Closing.  The representations and warranties

-6-

made by the Seller herein shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Company.

      6.11   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement and understanding among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings related to such subject matter.

      6.12   <u>Full Knowledge</u>. Each of the parties to this Agreement hereby acknowledges and represents that it has been given sufficient time to review this Agreement and the opportunity to seek legal counsel in connection with the transactions contemplated hereby, and has read this Agreement in its entirety, fully understands it and is in full accord with the terms hereof.

*(Signature Pages to Follow)*

IN WITNESS WHEREOF, the parties have executed this Share Redemption Agreement as of the date first written above.

COMPANY:

**CANOPY FINANCIAL, INC.**

Vikram A. Kashyap
Chief Executive Officer

Address:

201 Spear Street
Suite 1600
San Francisco, CA 94105

SIGNATURE PAGE TO SHARE REDEMPTION AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Share Redemption Agreement as of the date first written above.

**SELLER:**

**Entity Signature Block:**

_____
(Entity Name)

By: _____

Name: _____

Title: _____

Address: _____
          _____

Fax: _____
E-mail: _____

**Individual Signature Block:**

By: _____~Matthew get~_____

Name: _Douglas Matthew Ghertner_____

Address: _4425 Forsythe Place_____
          _Nashville, TN 37205_____

Fax: _615-743-6651_____
E-mail: _ghertner@yahoo.com_____

SIGNATURE PAGE TO SHARE REDEMPTION AGREEMENT

## Exhibit A

| Seller | Number of Shares Redeemed | | Gross Redemption Proceeds | Net Redemption Proceeds |
|---|---|---|---|---|
| | Series A | Common | | |
| Douglas Matthew Ghertner | 4,650 | 0 | $31,059.35 | $31,059.35 |

**EXHIBIT 2**

#9232          Paid 8/25/09          $31,059.35